**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: June 04, 2015.**



_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA
UNITED STATES BANKRUPTCY JUDGE**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § § § | CHAPTER 7 CASE |
| PRACS INSTITUTE SAN ANTONIO, LLC; | § § § | CASE NO. 13-50743 |
| _et al.,_ | § § | (Jointly Administered) |
| Debtors. | § § § | |

ORDER GRANTING TRUSTEE'S MOTION FOR APPROVAL OF: (I) THE
TRANSFER OF CUSTODY OF CERTAIN SPONSOR PROPERTY TO LACHMAN
CONSULTANT SERVICES, INC., (II) THE DESTRUCTION OF ANY UNCLAIMED
SPONSOR PROPERTY, (III) THE ABANDONMENT OF AND TRANSFER TO TEAM
SUPPORT SERVICES, LLC D/B/A ABRAXAS WORLDWIDE OF CERTAIN ESTATE
PROPERTY QUALIFYING AS "COMMON DOCUMENTS" BEARING ON SPONSOR
PROPERTY, AND (IV) A COMPROMISE RELATED TO FUNDING THE CLOSING
OF THESE CHAPTER 7 CASES

7396063v.30

CAME ON FOR CONSIDERATION the *Trustee's Motion for Approval of (I) the Transfer of Custody of Certain Sponsor Property to Lachman Consultant Services, Inc., (II) the Destruction of Any Unclaimed Sponsor Property, (III) the Abandonment of and Transfer to Team Support Services, LLC d/b/a Abraxas Worldwide of Certain Estate Property Qualifying as Common Documents Bearing on Sponsor Property, and (IV) a Compromise Related to Funding the Closing of These Chapter 7 Cases*, Docket No. 648 (the "Compromise Motion") filed by Jose C. Rodriguez, the duly-appointed Chapter 7 trustee (the "Trustee") for the jointly administered bankruptcy estates (the "PRACS Estates") of *In re PRACS Institute San Antonio, LLC* (Case No. 13-50743) (Lead Case), *In re PRACS Institute, LLC* (Case No. 13-50747), *In re PRACS Institute Holdings, LLC* (Case No. 13-50748), *In re PRACS Institute Miami, LLC* (Case No. 13-50746), and *In re PRACS Institute Management, LLC* (Case No. 13-50745) (together, the "Cases").[1]

On May 20, 2015, the Court held a hearing ("Hearing") on the Compromise Motion and all of the filed objections and responses thereto. Based on the Compromise Motion, the evidence adduced at the Hearing, the arguments of counsel and the record in these Cases, the Court

**HEREBY FINDS THAT**

A. This Court has jurisdiction over the Compromise Motion pursuant to 28 U.S.C. §§ 157 and 1334, including with respect to all Research Sponsors and all property addressed in this Compromise Order. Consideration of the Compromise Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Compromise Motion. "Unsearched Contents" as used herein means (x) the contents of the Unsearched Boxes currently stored at Novum/Gamma Fargo and other Third Party Storage Locations which contents, upon information and belief, consist of Sponsor Property, Common Documents, electronic data and perhaps other materials, (y) electronic data stored on servers currently located at Novum/Gamma Fargo and (z) electronic documents stored in other media at any of the Third Party Storage Locations.

2

B. Venue of these proceedings and the Compromise Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

C. The relief sought by the Compromise Motion is appropriate under the circumstances of these Cases, and sufficient cause exists for the granting of the Compromise Motion.

D. Subject to prior orders of abandonment entered in these cases, Research Sponsors own the Sponsor Property but the Debtors have a valid and continuing possessory interest therein. The Common Documents, to the extent they were ever property of the Debtors or the PRACS Estates pursuant to Section 541 of the Bankruptcy Code or otherwise, are burdensome to the PRACS Estates.I t therefore is a sound exercise of discretion by the Trustee to abandon and transfer custody of the Common Documents to Team Support Services, LLC d/b/a Abraxas (including any entity that succeeds to its rights and obligations hereunder, "Abraxas"); and, custody of the Sponsor Property and the Unsearched Contents to Lachman Consultant Services, Inc. (including any entity that succeeds to its rights and obligations hereunder, "Lachman") all in the manner set forth herein and in the Compromise Motion. The provisions of this Compromise Order shall control over the provisions of the Compromise Motion.

E. The Trustee's decision to enter into the Closing Compromise and to fund the wind-down and closing of these Cases pursuant to the Settlement Budget and the Closing Budget is a result of good-faith, arm's-length negotiations and constitutes a reasonable exercise of the discretion afforded to the Trustee under the Bankruptcy Code because, among other things: (i) the Trustee lacks sufficient unencumbered funds to effectuate the closing of these Cases in any other manner; (ii) the Trustee is unable to obtain unsecured credit on an administrative expense priority basis to effectuate the closing of these Cases; (iii) the current circumstances pre-

3

clude the Trustee from obtaining funding for the closing of these Cases from any source other than from the Lenders and the Funding Sponsors; and (iv) the Lenders, Lachman, and the Funding Sponsors are undertaking their rights and obligations herein in good faith and pursuant to this Compromise Order.

F.  Absent approval of the Closing Compromise and entry of this Compromise Order, the ability of the Sponsors and the Trustee to fund the preservation of Sponsor Property and Common Documents would be in jeopardy; the Trustee would likely be unable to pay all amounts due to the Third-Party Storage Providers; and the PRACS Estates would face an uncertain (and unfunded) course for properly disposing of Sponsor Property and Common Documents. Subsequent demands on Lachman, the Third-Party Storage Providers and the Trustee for access to Sponsor Property and Common Documents would likely need to be resolved through litigation. Such litigation would be costly, time-consuming, complex and uncertain and could require the Trustee, Lachman, the Third-Party Storage Providers and the Sponsors to incur significant expenses and professional fees.

G.  In light of the extraordinary circumstances of these Cases, the releases set forth below are appropriate, reasonable and necessary to effectuate the relief sought in the Compromise Motion and to carry out the provisions of the Bankruptcy Code.

H.  Due, timely, reasonable and proper notice of the Compromise Motion and the hearings relating thereto has been given under the circumstances to all Research Sponsors and interested parties known to the Trustee, all creditors and parties-in-interest in accordance with the Notice Order, including but not limited to the United States Attorney General's Office, the

4

United States Food and Drug Administration and certain other applicable state and federal regulatory bodies.

### THEREFORE, IT IS HEREBY ORDERED THAT

1.      Pursuant to 11 U.S.C. §§105, 362(d), 363(b), 363(c), 364(c), 554 and 725 and Bankruptcy Rules 4001(c), 6004, 6007 and 9019, the Compromise Motion is **GRANTED** as set forth herein.  All objections not otherwise withdrawn or resolved herein and in the Court's record are hereby overruled on their merits including but not limited to any objection based on jurisdictional grounds; provided, however, that InterMune, Inc. shall, at its sole expense (including any fees charged by Lachman), be permitted reasonable access to the Third Party Storage Facilities located in Fargo, North Dakota, which access shall be supervised and coordinated by Lachman to ensure compliance with prior Orders of this Court and other applicable rules and regulations, for a period of 30 days after entry of this Compromise Order, for the sole and limited purpose of reviewing its Sponsor Property to determine whether to elect to become a Preservation Sponsor (all as defined below).

2.      This Compromise Order is binding upon all persons and entities, including but not limited to all Research Sponsors, and shall inure to the benefit of the Trustee, Lachman, Abraxas, the Lenders, the Funding Sponsors, the Non-Participating Sponsors, all other Research Sponsors that are or become Preservation Sponsors or Common Documents Sponsors and each of their Related Parties.[2]

3.      In furtherance of the Closing Compromise, the Court hereby orders that:

---

[2] "Related Parties" means any party's agents, shareholders, employees, attorneys, officers, directors, parents, subsidiaries, affiliates, predecessors and successors in interest, each solely in its capacity as such.

5

A. **Election Form**

    i.      The form of Election Form, a copy of which is attached hereto as **Exhibit A**, is hereby approved. Pursuant to the Election Form, each Research Sponsor may elect to become a Preservation Sponsor, a Common Documents Sponsor, or both.

    ii.     The Election Form provides for any Research Sponsor who elects to become (a) a Preservation Sponsor to agree to be bound by all of the provisions of this Compromise Order applicable to Preservation Sponsors, including paying its pro rata share of the reasonable common costs (*i.e.*, those costs that are not allocable to a particular Sponsor but benefit all such Sponsors collectively) incurred on behalf of Preservation Sponsors, but excluding destruction costs (the "PS Common Costs")[3]; and (b) a Common Documents Sponsor to agree to be bound by all of the provisions of this Compromise Order applicable to Common Documents Sponsors, including paying its pro rata share of the reasonable common costs incurred by Lachman and Abraxas on behalf of the Common Documents Sponsors, excluding destruction costs (the "CDS Common Costs").

    iii.    Each Preservation Sponsor and Common Documents Sponsor also shall be obligated to pay the non-refundable sum of $5,000.00 (the "Initial Destruction Costs Payment" and collectively, the "Initial Destruction Costs Deposit") to Lachman within 60 days of the Effective Date.[4] The Initial Destruction Costs Deposit shall be held by Lachman in a segregated escrow account for the sole and exclusive purpose of paying the costs associated with the destruction of Sponsor Property and Unsearched Contents.

    iv.    The Election Form provides for a release of any and all Claims (as defined below) that each electing Research Sponsor has or may have against Lachman, Abraxas, the Funding Sponsors, Lilly, the Trustee or the Lenders.

    v.     Each Research Sponsor that desires to become a Preservation Sponsor or Common Documents Sponsor (or both) must complete and return the Election Form **no later than 15 days after the Effective Date** by e-mail to:

- rhornberger@pg-law.com (Ronald Hornberger, counsel to the Trustee);

- d.petshaft@lachmanconsultants.com (David Petshaft, counsel to Lachman); and

---

[3] The PS Common Costs shall not include any costs, fees or expenses that are directly attributable to a Preservation Sponsor's individual retrieval efforts.

[4] For the avoidance of doubt, any Research Sponsor that elects to become a Preservation Sponsor and a Common Documents Sponsor will be obligated to pay only a single Initial Destruction Costs Payment.

6

7396063v.30

- dwdykhouse@pbwt.com (David W. Dykhouse, counsel to Janssen, on behalf of the Funding Sponsors)

B. _**Preservation Sponsors: Transfer to Lachman of Custody of Individual Sponsor Property and Unsearched Contents**_

i. A "Preservation Sponsor" is a Research Sponsor that (a) (i) wishes to preserve the Unsearched Boxes and Unsearched Contents, whether located at a former PRACS location or at any of the other Third-Party Storage Locations, for at least two years following the Effective Date (the "Initial Minimum Preservation Period") and/or (ii) wishes to preserve an opportunity to retrieve individual study records or other materials constituting Sponsor Property that were stored with PRACS (either at a former PRACS location or any of the Third-Party Storage Locations) but that Lachman has not yet retrieved for such Research Sponsor; (b) has entered or enters into an agreement with Lachman to provide for the retrieval of its study records and materials; and (c) elects to become a Preservation Sponsor by completing the Election Form and returning it no later than 15 days after the Effective Date. Any Preservation Sponsor that does not wish to retrieve its individual Sponsor Property will not be required to enter into an individual agreement with Lachman, provided that if any such Preservation Sponsor subsequently desires to retrieve its individual Sponsor Property, it will be required to enter into an individual agreement with Lachman prior to such retrieval.

ii. Completing and signing the Election Form shall constitute a Preservation Sponsor's agreement to pay on a timely basis (a) its pro rata share of all PS Common Costs (such as rent, storage costs, utilities, insurance, IT services management/staff oversight and transportation costs) incurred by Lachman or Third-Party Storage Providers on behalf of the Preservation Sponsors), (b) the Initial Preservation Sponsor Payment, and (c) the Initial Destruction Costs Payment; **provided, however,** that the completion and signing of an Election Form shall not bind a Research Sponsor to the obligations of a Preservation Sponsor hereunder unless at least nine other Research Sponsors have also done so on a timely basis and have paid the Initial Preservation Sponsor Payment on a timely basis; **and provided further, however,** that nothing in this Compromise Order shall preclude any number of Research Sponsors that have elected to become Preservation Sponsors from agreeing to waive the foregoing proviso pertaining to the minimum number of Preservation Sponsors (whereupon the Research Sponsors so agreeing shall become Preservation Sponsors with the rights and obligations thereof).[5]

---

[5] Lachman shall refund the Initial Preservation Sponsor Payments and Initial Destruction Costs Payments to the Research Sponsors who have paid such Payments within a reasonable time after it is determined that an insufficient number of Research Sponsors have agreed to become Preservation Sponsors (or Research Sponsors electing to become Preservation Sponsors have not agreed to waive the condition requiring a minimum of 10) and paid the Initial Preservation Sponsor Payments. Upon making such refund Lachman shall have no further responsibility or liability

7

iii.   By electing to become a Preservation Sponsor, each Preservation Sponsor agrees to issue payment (the "Initial Preservation Sponsor Payment") to Lachman within 30 days of receiving notification of the amount of its pro rata share of the total estimated PS Common Costs payable to Third Party Storage Providers and Lachman for the entire Initial Minimum Preservation Period, which notification Lachman shall provide as promptly as possible after the Effective Date. While these monthly costs may decrease prior to or after the Effective Date based upon ongoing efforts to reduce such costs (such as through consolidation of Sponsor Property and the Unsearched Boxes at fewer Third-Party Storage Facilities), the Trustee understands based upon current available information received from Third-Party Storage Providers and Lachman that two years of PS Common Costs is estimated to be $875,000.

iv.   Assuming 25 Research Sponsors elect to become Preservation Sponsors, the Initial Preservation Sponsor Payment will be approximately $35,000 per Preservation Sponsor. Efforts will be made to reduce and maintain PS Common Costs as low as possible, as it is acknowledged that the feasibility of continued preservation of Sponsor Property and the Unsearched Contents will depend upon the number of participating Preservation Sponsors and amount of projected PS Common Costs. It is expected that the Initial Preservation Sponsor Payments will be deposited by Lachman into a segregated account for the exclusive benefit of the Preservation Sponsors with respect to satisfaction of PS Common Costs. Provided that (x) the minimum numerosity requirement of subparagraph (ii) above has been satisfied or waived by the electing Preservation Sponsors and such electing Preservation Sponsors have made their respective Initial Preservation Sponsor Payments and (y) the Initial Preservation Funding Date shall have occurred, Initial Preservation Sponsor Payments will be available for use by Lachman to inter alia, (a) pay outstanding rental and storage costs, (b) prepay rent or storage costs at the Third-Party Storage Locations for the entire Initial Minimum Preservation Period; and (c) pay Lachman for its reasonable fees and costs incurred on behalf of the Preservation Sponsors as agreed upon with the Preservation Sponsors. Further details and additional agreements necessarily will need to await negotiations and developments occurring after the Effective Date.

v.   For the avoidance of doubt, the Initial Preservation Sponsor Payment may not be the only pro rata payment of PS Common Costs required to be made by Preservation Sponsors during the Initial Minimum Preservation Period. Some PS Common Costs may be unknown as of the Effective Date but shall be paid at a later date by Preservation Sponsors as such costs arise.

---

to such Research Sponsors with regard to the Initial Preservation Sponsor Payments and the Initial Destruction Costs Payments.

vi.    For the avoidance of doubt, any PS Common Costs payable by Preservation Sponsors in their capacities as such are in addition to any other costs a Preservation Sponsor may be obligated to pay in (a) its separate capacity as a Common Documents Sponsor, and/or (b) in connection with its own individual retrieval efforts.

vii.    Due to the Preservation Sponsors' obligations to pay PS Common Costs in advance via the Initial Preservation Sponsors Payments, a Research Sponsor that fails to (a) timely return an Election Form containing an election to become a Preservation Sponsor or (b) timely make its Initial Preservation Sponsor Payment and Initial Destruction Cost Payment, may become a Preservation Sponsor thereafter, if at all, only on such terms and conditions as are acceptable to Lachman and a majority of the then-current and voting Preservation Sponsors, in such Preservation Sponsors' sole and absolute discretion, which terms and conditions will include without limitation a substantial late fee to be determined by such Preservation Sponsors at the time such Research Sponsor requests to become a Preservation Sponsor. Following expiration of the time period for return of completed Election Forms and payment of the Initial Preservation Sponsor Payment and Initial Destruction Costs Payment, under no circumstances shall a person or entity that is not a Preservation Sponsor be entitled to receive a return or copy of any portion of its Sponsor Property or the Unsearched Contents remaining under the custody of Lachman, regardless of whether such portion constitutes Sponsor Property or Common Documents and regardless of whether such portion is necessary for response to any type of inquiry, from the FDA or otherwise. Any Research Sponsor that does not become a Preservation Sponsor is prohibited from naming Lachman as its contact for FDA inspections/audits as it relates to Sponsor Property.

viii.    Provided that the Initial Preservation Funding Date shall have occurred, the Trustee shall be deemed to have transferred custody of any and all Sponsor Property, wherever located (but excluding any Sponsor Property that has already been returned to its Research Sponsor owner and any biological samples or study investigational products (test articles) that are located on the premises currently owned by JDC Management LLC or in the possession of Biospecimen or any other third party), to Lachman, effective as of the Effective Date, solely as a nominee in an administrative capacity in order to facilitate the retrieval and, as applicable, destruction of Sponsor Property on behalf of and for the benefit of the Preservation Sponsors and/or Common Documents Sponsors. For the avoidance of doubt, any biological samples or study investigational products (test articles) that are located on the premises currently owned by JDC Management, LLC or in the possession of Biospecimen or any other third party shall be considered abandoned by the Trustee, and not transferred to Lachman. The Trustee represents and warrants to Lachman that, to the best of his knowledge, there are no existing claims or any

9

potential claims by Research Sponsors or any other third parties relating to any of the Sponsor Property. In no event shall Lachman be deemed the "owner" of any Sponsor Property or Common Documents. Lachman shall have no liability whatsoever to any person or entity, including any of the Research Sponsors, PRACS, the Trustee, the PRACS Estates, third parties, patients, physicians, healthcare providers, as well as each of their Related Parties, for loss, abandonment, destruction or non-destruction of, or damage to, any Sponsor Property or Common Documents or otherwise in connection with Lachman's acts and/or omissions with regard to the subject matter of this Compromise Order, the Compromise Motion, the Global Agreement or the Gamma Order (as defined in footnote 10, below), as a result of its compliance with this Compromise Order or the Gamma Order (including, without limitation, in connection with vacating the Lachman Premises (as defined in the Gamma Order) or transferring of any Sponsor Property currently located at the Lachman Premises), or any claims or obligations with respect to the Sponsor Property or Common Documents, arising prior to or after the Initial Preservation Funding Date, including but not limited to any and all claims, known or unknown, except loss or damage to the extent proximately resulting from Lachman's legally-established gross negligence or willful misconduct.

ix.   On or immediately after the Initial Preservation Funding Date, the Trustee shall advise the Third-Party Storage Providers that, as a result of entry of this Compromise Order: (a) Lachman is the party having custody of any stored Sponsor Property and Unsearched Contents or Common Documents (but solely as custodian for and for the benefit of the Preservation Sponsors and the Common Documents Sponsors, as applicable) and (b) on and after the Initial Preservation Funding Date, Lachman is the party to receive invoices from the Third-Party Storage Providers, until termination of the Initial Minimum Preservation Period or such later date as agreed by Lachman and the Preservation Sponsors. Notwithstanding anything to the contrary contained herein, consistent with Section 3B(viii) of the Closing Compromise set forth above, Lachman is acting solely as a nominee in an administrative capacity on behalf of the Preservation Sponsors and Common Documents Sponsors with respect to the receipt of invoices for services rendered by Third-Party Storage Providers and collection and remittance of the funds necessary to pay the Third-Party Storage Providers and shall not bear any responsibility to the Third-Party Storage Providers for rent, storage and/or destruction costs.

x.   As of and after the Initial Preservation Funding Date, Lachman shall retrieve individual Sponsor Property on behalf of requesting Preservation Sponsors subject to terms and conditions to be agreed upon between or among Lachman and such Preservation Sponsors, with such retrievals to occur during the Initial Minimum Preservation Period, provided however that Lachman may withdraw for cause from its obligations hereunder, with no liability (other than for legally-established

10

gross negligence or willful misconduct), upon the later of (a) 60 days' written notice to all Preservation Sponsors; and (b) Lachman's remittance of all unused Initial Preservation Sponsor Payments paid to it hereunder, less any unpaid PS Common Costs incurred through the effective date of Lachman's withdrawal, as directed by the Preservation Sponsors. Notwithstanding the foregoing, the Initial Minimum Preservation Period may be extended by agreement of Lachman and any Preservation Sponsors that elect to continue their obligations as Preservation Sponsors after expiration of the Initial Minimum Preservation Period.

xi. The Preservation Sponsors shall be severally (but not jointly) responsible for Lachman's reasonable and necessary fees and costs associated with the provision of services to the Preservation Sponsors described in this Compromise Order (such amount to be allocated equally on a pro rata basis among all Preservation Sponsors). If a Research Sponsor elects to become a Preservation Sponsor under section 3A(iv) of this Compromise Order, but fails to pay the Initial Preservation Sponsor Payment as required under section 3B(iii) of this Compromise Order, such Research Sponsor shall not become a Preservation Sponsor. In this instance, Lachman shall have no duty or obligation to collect the Initial Preservation Sponsor Payment from any Research Sponsor that fails to comply with the terms of section 3B(iii) of this Compromise Order.

xii. Except as otherwise set forth herein, unless and until different terms are agreed to between or among Lachman and Preservation Sponsors, Lachman shall carry out its duties with regard to the Sponsor Property in its custody in accordance with this Compromise Order. Lachman shall have no obligations to the Research Sponsors (including the Preservation Sponsors) except as expressly provided herein, the Master Protocol, the Global Agreement, or another agreement, all as modified by this Compromise Order, or another order of the Court, as any such order or agreement may be amended or otherwise modified.

xiii. Provided that the Initial Preservation Funding Date shall have occurred, the Unsearched Contents shall be preserved for at least the Initial Minimum Preservation Period in accordance with the terms and conditions agreed to by and among the Preservation Sponsors, Lachman, and one or more of the Third Party Storage Providers, subject, however, to the reasonable discretion given to Lachman (or another independent consultant hired by the Preservation Sponsors for destruction) under the conditions described in sections 3B(xv), (xvi) and (xvii), below, to arrange or request reasonable assistance from Third-Party Storage Providers for the destruction of property belonging to Abandoning Sponsors (as defined below). It is anticipated that the Unsearched Boxes will remain in storage and remain largely unsearched and undisturbed during the Initial Minimum Preservation Period. However, pursuant to separate agreements with individual Preservation Sponsors, Lachman shall retrieve any portion of the Unsearched Boxes and Unsearched Contents on behalf of one or more of the requesting Preservation Sponsors (it be-

11

ing understood that each Preservation Sponsor shall be solely responsible for the payment of all fees and expenses associated with any individual retrievals of Unsearched Boxes and Unsearched Contents on its behalf); **provided, however,** that Lachman may withdraw from its obligations associated with any individual retrievals of Unsearched Boxes and Unsearched Contents under the terms of Lachman's agreement with that Preservation Sponsor.

xiv.    If the ongoing PS Common Costs exceed the sum of money collected on account of each Preservation Sponsor's Initial Preservation Sponsor Payment, Lachman shall send written notice including an invoice for the additional PS Common Costs to each Preservation Sponsor. If a Preservation Sponsor fails to pay any amount for PS Common Costs due from it to Lachman within 60 days from the invoice date, Lachman may, at its option, (a) seek to compel payment in this Court or any other court of competent jurisdiction and (b) until receipt of payment, suspend performance under any individual retrieval agreement with such delinquent Preservation Sponsor or otherwise refuse to perform any additional retrieval activities for such Preservation Sponsor. If, following the first anniversary of the Initial Preservation Funding Date and the exhaustion of Lachman's remedies against the delinquent Preservation Sponsor, such amount for PS Common Costs remains unpaid, Lachman may request that the other Preservation Sponsors pay the unpaid pro rata portion of PS Common Costs attributable to the delinquent Preservation Sponsor, failing which payment Lachman may withdraw, without liability for doing so (other than to remit all unused Initial Preservation Sponsor Payments paid to it hereunder,l ess any unpaid PS Common Costs incurred through the effective date of Lachman's withdrawal, as directed by the Preservation Sponsors), from the Closing Compromise on 60 days' written notice to all Preservation Sponsors and Common Documents Sponsors.

xv.    In addition to and not in lieu of the foregoing, (i) any Preservation Sponsor that fails to pay its pro-rata share of any additional PS Common Costs within 60 days after receiving written notice shall cease to be a Preservation Sponsor and shall be deemed to have abandoned and consented to the destruction of any of its Sponsor Property as of such sixtieth day; and (ii) any Research Sponsor that does not become a Preservation Sponsor shall be deemed to have abandoned and consented to the destruction of any of its Sponsor Property on or after the ninety-first day following occurrence of the Initial Preservation Funding Date (such Research Sponsors described in (i) and (ii), "Abandoning Sponsors").

xvi.    Any materials to be destroyed pursuant to this Compromise Order shall be totally destroyed as follows: (A) if the records are written, by completely shredding or burning the records; or (B) if the records are magnetic, optical or other electronic records, by otherwise destroying those records so that those records cannot be retrieved. Such destruction consistent with the foregoing requirements is sufficient for all purposes under state and federal law. Such destruction shall be deemed in

12

compliance with all applicable law so long as the material is destroyed in the manner set forth in this Compromise Order. None of the Trustee, Lachman, the Third-Party Storage Providers, the Funding Sponsors, Lilly, the Preservation Sponsors, the Common Documents Sponsors, the Lenders or any of their Related Parties shall have any liability whatsoever to each other or any Abandoning Sponsor for Sponsor Property that is abandoned or destroyed pursuant to this Compromise Order.[6] None of the Trustee, Lachman, the Third-Party Storage Providers, the Funding Sponsors, Lilly, the Preservation Sponsors, the Common Documents Sponsors, the Ad Hoc Destruction Sponsors, the Lenders or any of their Related Parties shall have any claim for contribution for costs or expenses incurred in connection with these Cases against any Research Sponsor that elects not to become a Preservation Sponsor or Common Documents Sponsor hereunder.

xvii.    Lachman (or another independent consultant hired by the Preservation Sponsors for destruction) shall have the reasonable discretion to arrange or request reasonable assistance from Third-Party Storage Providers for the destruction of property belonging to any Abandoning Sponsor, provided that Lachman shall not be obligated to the Preservation Sponsors to locate and destroy records, absent further agreement with the Preservation Sponsors. No further notice or order of the Court will be required.

xviii.    Unless extended by agreement of Lachman and any Preservation Sponsors, any remaining Sponsor Property (including without limitation any of the Unsearched Contents) that is not retrieved or otherwise preserved prior to the expiration of the Initial Minimum Preservation Period will be deemed and considered abandoned, whereupon Lachman (or another independent consultant hired by the Preservation Sponsors for destruction) shall arrange or request reasonable assistance from Third-Party Storage Providers for the destruction of all such remaining Sponsor Property. However, in the event the reasonably-estimated cost of such destruction exceeds the sum of the Initial Destruction Costs Deposit, the Destruction Escrow (as defined below) and any remaining balance of the Initial Preservation Sponsor Payments, then Lachman shall: (1) give at least 30 days' written notice of the amount of the shortfall to each Preservation Sponsor, Common Documents Sponsor and Abandoning Sponsor that has ever entered into an Individual Sponsor Retrieval Agreement with Lachman, (collectively, the "Ad Hoc Destruction Sponsors") and (2) request they collectively pay the required shortfall *plus* any charges

---

[6] The Court has already granted the Trustee the authority to abandon and/or destroy certain third party property, at his discretion through either himself, CDG or Lachman by the Destruction Authorization Order (Docket No. 462), which provides that the Trustee has no further duty or obligation to request any further authorization to dispose of and/or destroy Unknown Research Sponsor Property. The Court also previously has granted the Trustee's Notice of Intent to Abandon and Destroy Freezer and Refrigerator Contents Located at 4801 and 4901 Amber Valley Parkway, Fargo, ND (Docket No. 600) authorizing destruction of certain property as described therein.

13

for the storage of the remaining Sponsor Property expected to be incurred through the completion of destruction and Lachman's reasonable costs of providing the notice. In the event Lachman does not receive the amount of the shortfall within the notice period, Lachman shall have no obligation to destroy the abandoned Sponsor Property and no obligation to give any further notice to the Ad Hoc Destruction Sponsors regarding the abandoned Sponsor Property. Ad Hoc Destruction Sponsors shall have no liability related to the abandonment, destruction or non-destruction of the Sponsor Property, regardless of whether an Ad Hoc Destruction Sponsor provides funding or not.

   xix.   Except as otherwise set forth herein, unless and until different terms are agreed to between or among Lachman and the Preservation Sponsors, Lachman shall carry out its duties with regard to the Unsearched Boxes and Unsearched Contents in accordance with the Master Protocol and the Global Agreement. Lachman shall have no obligations to the Preservation Sponsors except as expressly provided herein, the Master Protocol or another agreement, or another order of the Court, as any such order or agreement may be amended or otherwise modified.

   xx.   Provided that the Initial Preservation Funding Date shall have occurred, the Trustee shall have no obligation, responsibility or liability whatsoever with regard to the Sponsor Property, including but not limited to storage, maintenance, protection, preservation, retrieval, removal or destruction, except that he and his agents shall not hinder, obstruct or otherwise interfere with the performance by Lachman or any Research Sponsor of their respective obligations under the Master Protocol, the Global Agreement, this Compromise Order, any other agreement between or among Lachman and any Funding Sponsor or Preservation Sponsor, or any other order of the Court.

C.   *Common Documents Sponsors*:  Abandonment by Trustee and Transfer of Common Documents to Abraxas

   i.   A "Common Documents Sponsor" is a Research Sponsor that (a) desires access to the Common Documents on or after the Effective Date, (b) agrees to pay its *pro rata* share of the CDS Common Costs (such as the CDS Common Costs that will be associated with the transfer, receipt, indexing and storage of Common Documents), including the reasonable fees and expenses of Abraxas and Lachman, and to be bound by the terms of the Abraxas Retention Agreement, and (c) elects to become a Common Documents Sponsor by completing the Election Form and returning it within 15 days after the Effective Date.

   ii.   Completing and signing the Election Form shall constitute a Common Documents Sponsor's agreement to pay on a timely basis (a) its pro rata share of all CDS Common Costs incurred by Lachman and Abraxas in connection with the performance of services on behalf of the Common Documents Sponsors as and when

14

such amounts are billed to the Common Documents Sponsors in accordance with this Compromise Order; and (b) the Initial Destruction Costs Payment, if not paid in such Common Documents Sponsor's capacity as a Preservation Sponsor; **provided, however,** that the completion and signing of an Election Form shall not bind a Research Sponsor to the obligations of a Common Documents Sponsor hereunder unless at least nine other Research Sponsors have also done so on a timely basis; **and provided further, however,** that nothing in this Compromise Order shall preclude any number of Research Sponsors that have elected to become Common Documents Sponsors from agreeing to waive the foregoing proviso pertaining to the minimum number of Common Documents Sponsors (whereupon the Research Sponsors so agreeing shall become Common Documents Sponsors with the rights and obligations thereof).[7]

iii. A Research Sponsor that fails to timely return the Election Form electing to become a Common Documents Sponsor and timely pay the Initial Destruction Costs Payment may become a Common Documents Sponsor thereafter, if at all, only on such terms and conditions as are acceptable to a majority of the then-current and voting Common Documents Sponsors in their sole and absolute discretion, which terms and conditions will include without limitation a substantial late fee. Under no circumstances shall a person or entity that does not become a Common Documents Sponsor be entitled to receive a copy of any portion of the Common Documents, regardless of whether such portion is necessary for response to any type of inquiry, from the FDA or otherwise.

iv. On the Effective Date, the Common Documents Sponsors shall be deemed to have retained Abraxas to receive, index and store Common Documents pursuant to the Abraxas Retention Agreement, a copy of which is attached hereto as **Exhibit B.** Abraxas shall carry out its duties with regard to the Common Documents in accordance with the Abraxas Retention Agreement and this Compromise Order.[8]

---

[7] Lachman shall refund the Initial Destruction Costs Payments to the Research Sponsors who have made such payments within a reasonable time after it is determined that an insufficient number of Research Sponsors have agreed to become Common Documents Sponsors or Research Sponsors electing to become Common Documents Sponsors have not agreed to waive the condition requiring a minimum of 10 electing Common Documents Sponsors. Upon making such refund Lachman shall have no further responsibility or liability to such Research Sponsors with regard to the Initial Destruction Costs Payments.

[8] If a Common Documents Sponsor desires enhanced guidance in connection with the retrieval of Common Documents beyond the indexing, storage and retrieval services that Abraxas will provide, such Common Documents Sponsor shall be free to engage Lachman or any other third party to assist with the retrieval of Common Documents from Abraxas, and nothing in this Compromise Order shall be construed to prohibit such engagement provided it is at the sole expense of such Common Documents Sponsor and provided that neither Abraxas nor any other Common Documents Sponsor shall have any obligations or liabilities whatsoever with respect to such enhanced services.

7396063v.30

v.    Abraxas has estimated that the total cost of this project, including intake of Common Documents, indexing, storage and project management will be approximately $185,000. This estimate does not include the costs associated with the preservation of electronic Common Documents.

vi.    Among other things, the Abraxas Retention Agreement contemplates an initial term of five years. It is anticipated that Abraxas will invoice the Common Documents Sponsors monthly for its services, except that its first invoice to the Common Documents Sponsors shall include the cost of storage for the entire initial term of the agreement. Abraxas has estimated that the cost of storage for this five-year period will be approximately $60,000, but that amount may fluctuate depending on the precise number of boxes of Common Documents stored by Abraxas (which number is not known at this time). This $60,000 estimate is a component of the $185,000 estimate set forth in the preceding paragraph, not an additional expense.

vii.    On the Effective Date, the Trustee shall be deemed to have abandoned and transferred to Abraxas custody and control of all Common Documents, whether in the custody, possession or control of Lachman, located in Third-Party Storage Locations if the Initial Preservation Funding Date occurs, or otherwise (but excluding all Common Documents located in Third-Party Storage Locations if the Initial Preservation Funding Date does not occur), all for the benefit of the Common Documents Sponsors, with such Common Documents to be maintained by Abraxas in accordance with the terms of the Abraxas Retention Agreement. Lachman, Abraxas, and all Third-Party Storage Providers are authorized and directed to co-operate as necessary and in good faith in connection with the prompt delivery to Abraxas of any Common Documents possessed or otherwise controlled by Lachman or such other Third-Party Storage Providers.[9] Absent a different agreement among the parties:

a.    All Common Documents that have already been segregated and identified by Lachman shall be made available to Abraxas by Lachman within 30 days after the Effective Date. Thereafter, Lachman shall give prompt written notice to Abraxas of any other Common Documents that are identified and segregated by Lachman while individual retrieval activities remain ongoing, and such additional Common Documents shall be made available to Abraxas as and when they are located.

b.  Following the Effective Date, Lachman, Abraxas and the Common Documents Sponsors shall meet and confer in good faith regarding Common Doc-

---

[9] To the extent necessary, the Trustee is authorized to require Lachman and any other third party in possession of Common Documents to deliver the Common Documents to Abraxas and shall not require an accounting of the value of the Common Documents.

uments in electronic or other intangible form, whereupon the Common Documents Sponsors shall make a determination regarding any ongoing storage and maintenance of such materials. It is anticipated that those Common Documents Sponsors that wish to preserve or access electronic or intangible Common Documents will be required to pay an additional amount to ensure such preservation and access.

c.  Any one or more of the Common Documents Sponsors and/or Lachman shall have the right to seek emergency relief from the Bankruptcy Court in the event of any dispute, delay or unforeseen development that arises in connection with the transition of custody or control of Common Documents from Lachman or any other third party to Abraxas, and this Court shall have exclusive jurisdiction to hear and determine such dispute.

viii.  Abraxas shall have no liability whatsoever to any person or entity, including any of the Research Sponsors, PRACS, the Trustee, the PRACS Estates, and each of their Related Parties, for loss of, destruction of, or damage to any Common Documents or otherwise in connection with Abraxas's acts and/or omissions with regard to the subject matter of this Compromise Order as a result of its compliance with this Compromise Order or any claims or obligations with respect to the Common Documents, arising prior to or after the Effective Date, including but not limited to any and all claims, known or unknown, except for loss or damage to the extent proximately resulting from Abraxas's legally-established gross negligence or willful misconduct.

ix.  Upon the completion of the transfer of custody of the Common Documents to Abraxas pursuant to this Compromise Order in good faith and in a professional manner, Lachman shall have no obligation, duties or liability to Abraxas, any Research Sponsor (including any Preservation Sponsor) or any third party whatsoever in any way relating to, arising out of or as a result of the transfer of the Common Documents to Abraxas and in any way relating to, arising out of or as a result of the maintenance, preservation or integrity of the transferred Common Documents except for loss or damage to the extent proximately resulting from Lachman's legally-established gross negligence or willful misconduct.

x.  From and after the Effective Date, the Trustee shall have no obligation, responsibility or liability whatsoever with regard to the Common Documents, including but not limited to storage, maintenance, protection, preservation, retrieval, removal or destruction, except that he and his agents shall not hinder, obstruct or otherwise interfere with the performance by Abraxas, Lachman or any Research Sponsor of their respective obligations under the Master Protocol, the Global Agreement, the Abraxas Retention Agreement, this Compromise Order, any other agreement between or among Lachman or Abraxas on the one hand and any Common Documents Sponsor on the other hand, or any other order of the Court.

17

xi. This Compromise Order and the Abraxas Retention Agreement shall govern the terms and conditions upon which Abraxas may destroy Common Documents.

xii. The Common Documents Sponsors shall be severally (but not jointly) responsible for Lachman's reasonable and necessary fees and costs associated with the transfer of Common Documents to Abraxas (such amount to be allocated equally on a pro rata basis among all Common Documents Sponsors).

D. **Funding Compromise**

i. The costs set forth in the "Settlement Budget" attached hereto as **Exhibit C**, which the Trustee represents includes all costs incurred by the PRACS Estates through and including May 31, 2014, shall be allocated as follows: 55% of such costs shall be satisfied (or have already been satisfied) out of the Lenders' cash collateral and 45% of such costs shall be satisfied (or have already been satisfied) out of the Funding Sponsors' cash collateral. Nothing contained in this paragraph or otherwise in this Compromise Order shall be construed to require the Lenders to contribute any additional funds to the PRACS Estates for any purpose other than as set forth on the Settlement Budget. Further, the Lenders are released and discharged from any existing or future obligation or liabilities related to the PRACS Estates, other than as set forth on the Settlement Budget, including without limitation any obligation or liability to provide further funding or to make payments to any existing or future creditor, claimant, or other party in interest in the PRACS Estates. The Trustee agrees, on behalf of himself and his Professionals, that they shall not be compensated for services rendered and costs incurred during the period through and including May 31, 2014, except as set forth in the Settlement Budget and following Court approval of duly filed applications for compensation.

ii. No later than three (3) business days after entry of this Compromise Order, the Trustee shall return to the Agent for the Lenders via wire transfer the sum of $388,039.74, which represents the remaining cash collateral of the Lenders pursuant to the Global Agreement that was not used to pay costs incurred in accordance with the Settlement Budget described in the immediately preceding paragraph (including 55% of any funds received by the Trustee after May 31, 2014, that are attributable to any sale or disposition of an asset, or agreement to pay a Funding Sponsor Payment or Non-Participating Sponsor Payment, which sale or agreement occurred or arose prior to May 31, 2014).

iii. The Trustee shall pay (or has already paid) 100% of the actual and necessary costs incurred by the PRACS Estates after May 31, 2014, pursuant and limited, on a line-item basis, to the costs and amounts set forth on the "Closing Budget" at-

18

tached hereto as **Exhibit D**,[10] out of the Funding Sponsors' remaining cash collateral (inclusive of any funds received by the Trustee after May 31, 2014 that are attributable to an agreement to pay a Funding Sponsor Payment or Non-Participating Sponsor Payment which agreement occurred or arose after May 31, 2014). The Trustee agrees, on behalf of himself and his Professionals, that they shall not be compensated for services rendered and costs incurred during the period after May 31, 2014, except as set forth in the Closing Budget and following Court approval of duly filed applications for compensation. Nothing contained in this paragraph or otherwise in this Compromise Order shall be construed to require the Funding Sponsors to contribute any additional funds to the PRACS Estates for any purpose. Further, the Funding Sponsors, Lachman, and Lilly are released and discharged from any existing or future obligation or liabilities related to the PRACS Estates, including without limitation any obligation or liability to provide further funding or to make payments to any existing or future creditor, claimant, or other party in interest in the PRACS Estates.

iv.    If, after entry of an order approving the Trustee's Final Report, there are any amounts remaining in the Trustee's possession that constitute cash collateral of the Funding Sponsors, and such amounts are not used or reserved to pay costs incurred or to be incurred in accordance with sections 3D(i) and 3D(iii), above, then the Trustee shall return such amounts to the Funding Sponsors (in the same proportion as their original payments to the Trustee pursuant to the Global Agreement) via wire transfer or check for application against the outstanding Sponsor Loans as set forth on Exhibit A to the Global Agreement.

E.    **Other Provisions.**

i.    This Compromise Order and the Closing Compromise shall become effective on the Effective Date. Certain events and obligations, however, are subject to the occurrence of (x) the Effective Date; (y) the payment by the Trustee of all arrear-

---

[10] To the extent not included in the specific expenditures set forth on the Closing Budget, the Trustee is hereby directed to pay (or reserve for payment, where further Court approval is required), solely out of any Funding Sponsor Payment, Non-Participating Sponsor Payment or other amount received by the Trustee subsequent to the filing of the Compromise Motion: (a) all amounts due or that will become due to Third-Party Storage Providers through and including the Effective Date, (b) subject to Court approval, the accrued and unpaid fees of the Trustee's Professionals, not to exceed $30,000, and (c) $75,000 to pay any reasonable costs or expenses actually incurred by Gamma in connection with enforcement of its rights under the order granting it relief from stay ("Gamma Order"), including, among other things, costs of destruction or other resolution of Sponsor Property remaining or left abandoned in the Lachman Premises (as defined in the Gamma Order) on the effective termination date of occupancy, but specifically excluding attorney's fees and any costs associated with efforts to terminate Lachman's occupancy of the Lachman Premises. Any remaining balance shall be paid to Lachman (the "Destruction Escrow), which amount shall be used by Lachman solely and exclusively for the secure destruction of Sponsor Property in accordance with this Compromise Order. If, at the conclusion of these Cases, the Trustee is still holding any portion of the $75,000 referred to in the preceding clause (c), such amount shall be paid to Lachman and added to the Destruction Escrow. The foregoing expenditures shall not decrease the amount due to the Lenders hereunder.

ages to Third-Party Storage Providers through the Effective Date; and (z) Lach-man's receipt of not less than an aggregate of $875,000 on account of Initial Preservation Sponsor Payments and not less than an aggregate of $50,000 on account of Initial Destruction Costs Payments (the date that is one business day following the later to occur of (y) and (z) shall be the "Initial Preservation Funding Date"), which events and conditions are expressly stated to be subject thereto.

ii.       Within five business days after the Effective Date, the Trustee shall file a notice confirming the occurrence of the Effective Date and confirming the deadline for submission of completed Election Forms (which deadline shall be 15 days after the Effective Date).

iii.      On the Effective Date, the Trustee (on behalf of himself and all of his Professionals), Lachman, Abraxas, the Funding Sponsors, Lilly and the Lenders shall all be deemed to have released each other and their respective Related Parties from any and all expenses, claims, liabilities, obligations, demands, actions or causes of action of whatever kind or nature (whether known or unknown, liquidated or unliquidated, direct or indirect, fixed or contingent, asserted or unasserted, disclosed or undisclosed, matured or unmatured, existing or hereafter arising, in law, equity and otherwise, and notwithstanding the manner in which the same shall have arisen) based on facts arising or occurring at any time through and including the Effective Date that relate to these Cases ("Claims"); **provided, however,** that the foregoing release shall not be construed to release any of the released parties from any Claim or obligation arising under or pursuant to, or liability for compensatory damages for the material breach of, this Compromise Order or any other future order of the Court entered in these Cases (including any agreement approved by such an order), or any other written agreements between Lachman and any Research Sponsors; or any Claim (whether against itself or another person for which it is vicariously liable as a matter of law or contract) for legally-established gross negligence or willful misconduct.

iv.       The Master Consulting Agreement shall terminate on the earlier of (a) the Initial Preservation Funding Date and (b) the date on which the Master Consulting Agreement is terminated by the parties thereto in accordance with its terms. Such termination hereunder shall not limit the extent to which provisions thereof survive following termination in accordance with its terms or which, by their nature, survive termination. The Global Agreement and the Master Protocol remain in effect in accordance with their terms except as those terms are modified by this Compromise Order. In the event of any conflict, this Compromise Order controls.

v.        In any action or proceeding to enforce any rights hereunder, including the rights of Lachman and Abraxas to be paid all amounts due for services to be rendered hereunder, the prevailing party shall be entitled to collect its reasonable attorney's fees and costs.

20

vi. This Court shall retain exclusive jurisdiction to enforce and order compliance with the Global Agreement and this Compromise Order and to hear and determine any disputes arising out of the interpretation or implementation of the Global Agreement and this Compromise Order, with the sole exception provided by Paragraph 3B(xiv).

vii. Without further order of the Court, (a) the Preservation Sponsors and Lachman shall be authorized to implement such other procedures for the retrieval of Sponsor Property and preservation of the Unsearched Boxes and Unsearched Contents that are not inconsistent with the terms of this Compromise Order, and (b) the Common Documents Sponsors and Abraxas shall be authorized to implement such other procedures for the retrieval and processing of Common Documents that are not inconsistent with the terms of this Compromise Order.

4. The reversal or modification of any portion of this Compromise Order, whether on appeal therefrom or upon reconsideration by this Court, will not affect the validity of the funding mechanisms set forth herein pursuant to the Settlement Budget and the Closing Budget or the releases and provisions limiting any party's obligations, duties and liability (as set forth in the Election Form and in sections 3B(viii), 3B(xvi), 3B(xviii), 3B(xx), 3C(viii), 3C(ix), 3C(x), 3D(i), 3D(iii) and 3E(iii), above), all of which releases and provisions are hereby approved in all respects.

5. This Compromise Order is a final order and shall become effective immediately upon being entered by the Court. The stay provided for by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, to the extent it would otherwise apply, shall not be applicable to this Compromise Order. The period during which an appeal from this Compromise Order must be filed shall commence upon the entry of this Compromise Order.

###

7396063v.30

**EXHIBIT A**

|  | § |  |
| --- | --- | --- |
| **In re:** | § | **CHAPTER 7 CASE** |
|  | § |  |
| **PRACS INSTITUTE SAN ANTONIO,** | § | **CASE NO. 13-50743** |
| **LLC,** *et al.,* | § |  |
|  | § | **(Jointly Administered)** |
| **Debtors.** | § |  |

## ELECTION FORM

This Election Form is submitted pursuant to this Court's *Order Granting Trustee's Motion for Approval of: (I) the Transfer of Custody of Certain Sponsor Property to Lachman Consultant Services, Inc., (II) the Destruction of any Unclaimed Sponsor Property, (III) the Abandonment of and Transfer to Team Support Services, LLC d/b/a Abraxas Worldwide of Certain Estate Property Qualifying as "Common Documents" Bearing on Sponsor Property, and (IV) a Compromise Related to Funding the Closing of these Chapter 7 Cases,* dated June __, 2015 (the "Compromise Order"). Capitalized terms used herein have the meanings given to them in the Compromise Order. The undersigned Research Sponsor hereby elects to become the following (check all that apply):

      ☐  A PRESERVATION SPONSOR

      ☐  A COMMON DOCUMENTS SPONSOR

This Election Form must be returned no later than 15 days after the Effective Date, as defined in the Compromise Order, by e-mail to the following:

- rhornberger@pg-law.com (Ronald Hornberger, counsel to the Trustee);

- d.petshaft@lachmanconsultants.com (David Petshaft, counsel to Lachman); and

- dwdykhouse@pbwt.com (David W. Dykhouse, counsel to Janssen, on behalf of the Funding Sponsors)

By completing and returning this Election Form, the undersigned Research Sponsor (A) agrees to be bound by all of the terms and conditions of the Compromise Order applicable to the selection or selections it has made above, including but not limited to the payment of its pro rata share of all common costs incurred by Lachman (or, if applicable, Abraxas) in connection with its selection, and (B) hereby releases Lachman, Abraxas, the Funding Sponsors, Lilly, the Trustee and the Lenders from any and all expenses, claims, liabilities, obligations, demands, actions or causes of action of whatever kind or nature (whether known or unknown, liquidated or unliquidated, direct or indirect, fixed or contingent, asserted or unasserted, disclosed

or undisclosed, matured or unmatured, existing or hereafter arising, in law, equity and otherwise, and notwithstanding the manner in which the same shall have arisen) based on facts arising or occurring at any time through and including the Effective Date that relate to these Cases ("Claims"); provided, however, that the foregoing release shall not be construed to release any of the released parties from any Claim or obligation arising under or pursuant to, or liability for compensatory damages for the material breach of, the Compromise Order or any other future order of the Court entered in these Cases (including any agreement approved by such an order), or any other written agreements between Lachman and any Research Sponsors; or any Claim (whether against itself or another person for which it is vicariously liable as a matter of law or contract) for legally-established gross negligence or willful misconduct.

**Any Research Sponsor that does not become a Preservation Sponsor (or that fails to cure any non-compliance with its obligations as a Preservation Sponsor within 15 days after receiving written notice of such non-compliance) in accordance with the terms of the Compromise Order shall be deemed to have abandoned and consented to the destruction of any of its Sponsor Property, wherever located, remaining in the possession, custody or control of the Trustee, Lachman or any Third-Party Storage Provider. The Compromise Order further provides that none of the Trustee, Lachman, the owners and operators of the Third-Party Storage Providers, the Funding Sponsors, Lilly, the Preservation Sponsors, the Common Documents Sponsors, the Lenders or any of their respective officers, directors, employees, agents or professionals shall have any liability whatsoever to any such Sponsor whose Sponsor Property is abandoned or destroyed pursuant to the Compromise Order. Destruction of Sponsor Property known to belong to Research Sponsors who elect not to become Preservation Sponsors may commence on or after the 91st day following occurrence of the Effective Date. No further notice or order of the Court will be required.**

WHEREFORE, the undersigned hereby agrees to all of the terms and conditions set forth above and in the Compromise Order, and desires to make the elections indicated above:

_____
(Print name of Research Sponsor)

_____
(Signature of Authorized Individual)

_____
(Print name of individual completing this Election Form)

_____
(Print e-mail address of individual completing this Election Form)

_____
(Print date)

**EXHIBIT B**

**MASTER SERVICES AGREEMENT (Abraxas Retention Agreement)**

This Master Services Agreement ("***Agreement***"), effective as of March ___, 2015 ("***Effective Date***"), is made by and between the **Common Documents Sponsors** (as defined in the Order of the United States Bankruptcy Court for the Western District of Texas Approving *Trustee's Motion for Approval of (I) the Transfer of Custody of Certain Sponsor Property to Lachman Consultant Services, Inc., (II) the Destruction of Any Unclaimed Sponsor Property, (III) the Abandonment of and Transfer to Team Support Services, LLC d/b/a Abraxas Worldwide of Certain Estate Property Qualifying as "Common Documents" Bearing on Sponsor Property, and (IV) a Compromise Related to Funding the Closing of These Chapter 7 Cases* (the "***Compromise Order***")) and **Team Support Services, LLC d/b/a Abraxas Worldwide** ("***Vendor***" or "***Abraxas***"), a Michigan limited liability company with its principal place of business at 701 East Milham Avenue, Portage, Michigan 49002. The Common Documents Sponsors and Vendor are hereinafter sometimes each referred to as a "***Party***" and collectively as the "***Parties***."

In consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be bound, agree as follows:

1.     **Engagement.** As a result of and effective through the Compromise Order, the Common Documents Sponsors have engaged Vendor to provide the services set forth in the Compromise Order (as more particularly described on Annex A hereto, the "***Services***") under the terms and conditions of this Agreement, which is subject in all respects to the Compromise Order, and Vendor hereby accepts such engagement.

2.     **Performance.** Vendor shall perform the Services in a competent, diligent and workmanlike manner with reasonable skill and care in accordance with the terms of this Agreement, records and information management best industry standards of professional conduct and applicable law. Vendor shall provide all materials, facilities, supplies and sufficiently skilled and experienced personnel necessary to perform Services as set forth in the Compromise Order, and time shall be of the essence in performing the Services. To the extent necessary to perform the Services, Vendor shall cooperate and coordinate with Lachman Consultant Services, Inc. Vendor shall report to the Common Documents Sponsors as they may reasonably request from time to time.

3.     **Direction from Common Documents Sponsors.** In performing the Services and carrying out its duties hereunder, Vendor shall be entitled to conclusively rely on any direction given by a majority of the then-current and voting Common Documents Sponsors. If, in the reasonable discretion of Vendor, a particular matter is not material to the Services but nevertheless requires a direction by the Common Documents Sponsors, Vendor may obtain such direction by way of a reasonable "negative notice" procedure.

4.     **Invoicing and Payment.**

(a)     Vendor shall submit written invoices to the Common Documents Sponsors for Services performed at least every 30 days during the period of performance of Services and shall provide supporting documentation as reasonably requested by any Common Documents Spon-

sor, except that Vendor's first invoice to the Common Documents Sponsors shall include the entire cost of storage for the duration of the term of this Agreement (which amount is estimated to be approximately $60,000). Each invoice shall include both the total compensation sought for the period and the amount due from each Common Documents Sponsor individually (with the latter amount calculated by dividing the total amount due by the then-current number of Common Documents Sponsors). Payment of each invoice shall be in full compensation for Services performed thereunder. All amounts shall be payable within 30 days of date of invoice. The Vendor and the Common Documents Sponsors will cooperate with respect to the calculation and allocation of any credits or refunds owed to any Common Documents Sponsors on account of additional parties becoming Common Documents Sponsors after the Effective Date.

(b)     Vendor may terminate this Agreement on 45 days' written notice to all Common Documents Sponsors if any portion of its first invoice remains unpaid for more than 60 days. Thereafter, if a Common Documents Sponsor fails to pay any amount due from it to Vendor, Vendor may, at its option, (a) seek to compel payment in a court of competent jurisdiction, or (b) until receipt of payment, refuse to respond to any requests or inquiries from such delinquent Common Documents Sponsor or otherwise refuse to perform any additional retrieval activities for such Common Documents Sponsor. If, following the second anniversary of the Effective Date and the exhaustion of Vendor's remedies against the delinquent Common Documents Sponsor, such amount remains unpaid, Vendor may request that the other Common Documents Sponsors pay the unpaid pro rata amount attributable to the delinquent Common Documents Sponsor, failing which payment Vendor may withdraw, without liability for doing so, from the this Agreement on 60 days' written notice to all Common Documents Sponsors.

(c)     All obligations of the Common Documents Sponsors to Vendor hereunder shall be several and not joint.

(d)     This Agreement relates to the provision of Services only, and Vendor shall not purchase equipment, goods, software or other tangible or intangible property for which it will seek reimbursement from the Common Documents Sponsors without express prior written authorization from a majority of the then-current and voting Common Documents Sponsors.

5.     **Ownership of Work Product**. All right, title, and interest in and to the Common Documents (as defined in the Compromise Order) supplied to Vendor shall be and remain the exclusive property of the Common Documents Sponsors, shall be kept by Vendor strictly for performance of Services, and shall not be reallocated to any other work whatsoever, except that Vendor retains exclusive ownership of all of its confidential information. All right, title and interest in and to all data, information, documents, copyrights, materials and sole or joint inventions of Common Documents Sponsors relating to or arising out of the Services ("*Work Product*") shall belong to and be the property of the Common Documents Sponsors except that Vendor shall retain all right, title and interest in and exclusive or joint ownership of any inventions, designs or proprietary processes invented or developed solely or jointly by Vendor during the performance of Services. Vendor does hereby assign to the Common Documents Sponsors and their Successors all right, title and interest in and to the Work Product to the extent effective in advance, and where not effective shall promptly do and ensure that its Representatives do all acts and sign all documents necessary to perfect the right, title and interest in and to such Work Product as shall be requested by one or more of the Common Documents Sponsors, all at the expense

of the requesting Person(s). All Work Product prepared by Vendor in the performance of Services shall be promptly surrendered by Vendor to the Common Documents Sponsors upon their request, or on the earlier to occur of the termination or expiration of this Agreement.

6. **Confidentiality**

(a)     Each Party acknowledges that the Confidential Information is highly confidential and shall take all steps necessary to insure that it is kept in confidence by it and its employees, Affiliates and contractors. Confidential Information may be disclosed, on a strictly need-to-know basis, to certain Persons, including employees, Affiliates and contractors of a Party, who have agreed in writing to maintain its confidentiality in accordance with this section.

(b)     If a Party receives a request or demand, by subpoena or otherwise, from a Person that appears to seek disclosure or production of Confidential Information from such Party or any of its Affiliates, employees, contractors or counsel (other than a request or demand for access to Confidential Information received from the U.S. Food and Drug Administration), such Party shall immediately notify all other Parties and shall not voluntarily surrender or disclose any such Confidential Information without first providing, to the extent permitted by Applicable Law, the Common Documents Sponsors a reasonable opportunity to protect their interests in an appropriate court or in other appropriate manner. Notwithstanding anything to the contrary in this Agreement, no Party shall be obligated hereunder to refuse to obey any Applicable Law that has not been stayed.

7. **Term and Termination.**

(a)     This Agreement shall become effective as of the Effective Date and shall continue in effect for a period of five (5) years ("Term"). The Term may be extended only upon written agreement of Vendor and the Common Documents Sponsors (or such of them as choose to remain Common Documents Sponsors for the purpose of extending the Term).

(b)     This Agreement may be terminated by Vendor as set forth in paragraph 4(b). This Agreement may be terminated by the Common Documents Sponsors upon 30 days' written notice and payment of all costs to Vendor (including either the cost of destroying any remaining Common Documents or the cost of transporting the remaining Common Documents to another service provider). Vendor's right to demand payment for all amounts due hereunder shall survive termination of this Agreement.

8. **Relationship of Parties.** With respect to the subject matter of this Agreement, the Parties are and remain independent contractors. This Agreement shall not be deemed to create an employer/employee relationship, joint venture, partnership, association or agency between the Parties. No Party is authorized to incur or create any obligation, express or implied, on behalf of another Party or to bind another Party in any manner whatsoever.

9. **Compliance with Laws.** In performing its obligations under this Agreement, Vendor shall comply with all Applicable Laws timely and in full without any waiver thereof or deviation therefrom, notwithstanding the consent of a Governmental Entity or any other Person to such waiver or deviation, unless the Common Documents Sponsors shall also have consented thereto. Vendor further agrees that it will comply with any stated policies and procedures of the

Common Documents Sponsors including those governing the privacy and security of protected health information, safety, health, harassment and discrimination, in each case as provided to Vendor in writing in advance.

**10.** **Indemnification and Waiver.** Vendor shall hold harmless and indemnify the Common Documents Sponsors and their Representatives from and against all suits, demands, losses, damages, judgments, claims or other liability incurred by any of them (including without limitation, property damage and personal injury or death) and shall pay all costs, including reasonable attorneys' fees and costs (collectively "***Liability***"), to the extent that such Liability arises directly from, or is directly related to Vendor's material breach of the Compromise Order or this Agreement or an order of the Bankruptcy Court or the gross negligence, recklessness, willful misconduct or illegal conduct of Vendor or any of its Representatives that is criminal, fraudulent or found by the presiding court to be otherwise illegal.

**11.** **Insurance.** Vendor shall maintain at its sole cost and expense insurance policies meeting the minimum insurance levels set forth below and shall provide certificates of such insurance evidencing the limits and expiration dates upon request:

(a) Worker's Compensation—in accordance with applicable statutory requirements;

(b) Commercial General Liability—not less than $1,000,000 per occurrence; $2,000,000 general aggregate; and $3,000,000 products/completed operations aggregate.

(c) Automobile Liability—not less than $1,000,000 per occurrence; and

(d) Applicable Professional Liability—not less than $2,000,000 per occurrence.

**12.** **Representations and Warranties.** There are no representations or warranties, express or implied, made by the Common Documents Sponsors (or any of their Affiliates) to Vendor in connection with this Agreement or the transaction(s) contemplated hereby. Vendor represents and warrants to the Common Documents Sponsors as follows:

(a) Vendor has facilities, supplies, staff and experience sufficient to perform the Services efficiently and expeditiously, and in accordance with the records and information management best industry standards, the terms of this Agreement and applicable law, including, if applicable, cGLP and cGCP;

(b) Vendor shall perform the Services without any unauthorized or unlawful use of any third party intellectual property, proprietary information or know-how; provided, however, that the foregoing shall not include off-the-shelf software licensed to Vendor under a shrink-wrap license agreement;

(c) No Work Product provided by Vendor in connection with the performance of the Services will use any intellectual property, proprietary information, content, software or other materials of any other Person unless such use is authorized by such Person or permitted by Applicable Laws;

(d)     Vendor is (and agrees that it shall continue to be) a duly organized and validly existing Person in good standing under the Applicable Law of the jurisdiction of its formation and has (and agrees that it shall continue to have) the power to execute and deliver this Agreement and perform its obligations hereunder;

(e)     The execution, delivery and performance of this Agreement by Vendor: (i) do not and will not conflict with or result in breach of any term, condition, obligation or restriction of any other agreement of Vendor with any third party; (ii) have been duly authorized by all necessary action on its part and the part of its Governing Body, and this Agreement has been duly executed and delivered by it; and (iii) do not breach its Governing Documents and do not and will not violate any Applicable Law. This Agreement constitutes its legal, valid and binding obligation, enforceable against it and its Successors in accordance with its terms;

(f)     No consent, approval or authorization of or declaration or filing with, or the taking of any other action by or in respect of, any Person is required in connection with Vendor's execution, delivery and performance of this Agreement which has not been obtained or made, and such execution, delivery and performance by it are, except as otherwise expressly provided in this Agreement, unconditional; and

(g)     Neither Vendor nor any of its Representatives or contractors that will perform any services under this Agreement has ever been debarred pursuant to the United States Food, Drug and Cosmetic Act or excluded from any federal health care program (including Medicare or Medicaid), and it will notify the Common Documents Sponsors immediately if any of the foregoing occurs.

13.     **Miscellaneous Provisions.**

(a)     <u>Governing Law; Consent to Jurisdiction</u>. This Agreement (including this choice-of-law provision) and the rights and obligations of the Parties hereunder shall be governed by and construed, and all controversies and disputes arising under, in connection with or relating to this Agreement shall be resolved, in accordance with the laws of the State of **Michigan** and the United States of America applicable to contracts made and to be wholly performed within such State by Persons residing or having their principal places of business therein. All Parties irrevocably submit to the exclusive jurisdiction and venue of the Bankruptcy Court for the purpose of any action or other proceeding arising under, in connection with or relating to this Agreement and consent to the entry of final judgments by the Bankruptcy Court. **Each Party waives any defense, objection, or other ability to contest personal jurisdiction and venue therein based on grounds of _forum non conveniens_ or otherwise, and each Party hereby waives any right to a trial by jury in any such action or other proceeding.**

(b)     <u>Non-Waiver; Remedies</u>. No delay by or omission of a Party in exercising any right, power, privilege, or remedy shall impair such right, power, privilege, or remedy or be construed as a waiver thereof. The rights and remedies provided in this Agreement are cumulative and are not exclusive of other rights or remedies provided by Applicable Law.

(c)     <u>Taxes</u>. Vendor shall be fully responsible for payment of all income, social security, or other taxes or payments that may be due and owing by Vendor as the result of fees or

amounts paid to it for the performance of the Services, and Vendor shall indemnify and hold the Common Documents Sponsors harmless from and against any such tax or payment.

(d) <u>Notices</u>. Notices shall be given by first class mail, express mail, facsimile (followed by confirmation) or overnight delivery, addressed to the applicable Party at the corresponding address given in the preamble of this Agreement, or to such other address as a Party may designate in writing.

(e) <u>Use of Name</u>. No Party shall use the name, tradename or trademark of another Party in any press release, advertisement, publicity material or promotional activity without the prior written consent of such other Party.

(f) <u>Headings</u>. Headings and titles of parts and sections of this Agreement are for convenience only and have no interpretative significance.

(g) <u>Survival</u>. The provisions of Section 4 (Ownership of Work Product), Section 10 (Indemnification and Waiver) and Section 13 (Miscellaneous Provisions) shall survive the expiration or termination of this Agreement for any reason.

(h) <u>Successors</u>. This Agreement and the covenants hereof are binding upon the Parties and their respective Successors and shall inure to the benefit of the Parties and their respective Successors. There are no intended third-party beneficiaries of this Agreement.

(i) <u>Assignment</u>. Except as otherwise provided in the succeeding sentence, this Agreement may not be assigned by Vendor without the prior, express written consent of a majority of the then-current and voting Common Documents Sponsors. Vendor may assign or transfer this Agreement without consent to any Affiliate or in connection with the merger, consolidation or transfer of all or substantially all of that portion of its assets to which this Agreement relates.

(j) <u>No Unreasonable Delay</u>. At any time and from time to time and without further consideration, each Party shall execute, acknowledge and deliver all such other instruments and take such other actions as another Party may reasonably determine to be necessary or desirable in order to consummate the transactions contemplated by this Agreement. Whenever the consent or approval of a Party is required thereby for the taking of any action and no standard is otherwise provided therefor in this Agreement, such consent or approval, having been duly sought, shall not be unreasonably withheld, conditioned or delayed.

(k) <u>Unenforceability</u>. If any provision of this Agreement or the application thereof to any Person or circumstance is held by a Governmental Entity of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, and the application of such problematic provision to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement, including the problematic provision, shall be valid and enforceable to the fullest extent permitted by Applicable Law, but only so long as the economic and legal substance of the transaction(s) contemplated thereby is not affected in a manner that is materially adverse to any Party. Upon a determination of such invalidity or unenforceability, the Parties shall negotiate in good faith to modify this Agreement so as to effect its original intent as closely as possible in an acceptable and rea-

sonable manner in order that the transaction(s) contemplated thereby may be consummated as originally contemplated to the fullest possible extent consistent with Applicable Law.

(l)     Entire Agreement.  This Agreement constitutes the entire agreement among the Parties with respect to the transaction(s) contemplated hereby and wholly supersedes any and all previous agreements and understandings among them, oral or written, relating thereto.

(m)     TIME IS OF THE ESSENCE with respect to every provision of this Agreement and obligation arising hereunder.

(n)     Relationship of Parties.  The relationship of the Parties is and shall at all times continue to be that of contractual counterparties.  No Party shall represent itself or hold itself out to be, a representative, partner, joint venturer or agent of any other Party for any purpose whatsoever and no Party shall purport to act for any other Party in the creation or assumption of any obligation or liability whatsoever.  Nothing contained in this Agreement shall be construed to cause a Party to be obligated to assume, perform or discharge any obligation or liability of any other Party.

**14.     Definitions and Principles of Construction.**  The following terms have the following meanings when used in this Agreement.  Capitalized terms not defined in this Section 14 have the meanings given to them in the Compromise Order.

(a)     An "Affiliate" of a Person means any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person.  For purposes of this definition, a Person shall be deemed to be controlled by another Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of its management and policies by ownership, contract or otherwise.

(b)     "Applicable Law" means all of the following, as amended, re-enacted, supplemented or otherwise modified from time to time and as in effect at the relevant time: (i) the rules, regulations, guidelines, directions, requirements and publicly disclosed policies of the U.S. Food and Drug Administration; (ii) other applicable constitutions, codes, statutes (including the interpretation or administrative guidelines of any Governmental Entity charged with the enforcement, interpretation or administration thereof), laws (including common law and principles of equity), treaties, ordinances, rules, regulations, executive orders, directives, decisions, directions or requirements of any Governmental Entity; (iii) orders (including consent and stipulated orders), judgments, decrees, writs, injunctions and other decisions and determinations of any court or other tribunal; and (iv) awards and other determinations of any arbitrator.

(c)     "Confidential Information" means (a) all Common Documents received by Vendor for storage pursuant to the Compromise Order and (b) any information provided to Vendor by a Common Documents Sponsor that the providing Common Documents Sponsor designates as such.

(d)     "Governing Body" means, with respect to a Person other than an individual or a Governmental Entity, the board of directors, managers or trustees of such Person or any duly authorized committee of that board, or, if there is no board of directors, managers or trustees, the

Person or body that, pursuant to Applicable Law or the Governing Documents of such Person, is vested with powers similar to those vested in a board of directors, managers or trustees.

(e) "<u>Governing Documents</u>" means, with respect to any Person other than an individual or a Governmental Entity, the certificate or articles of incorporation, charter, bylaws, operating agreement, partnership agreement, trust agreement, joint venture agreement and other organizational or constitutive documents of such Person, as amended, and any notice or other document with respect thereto filed in connection with the Person's formation or organization with any Governmental Entity in the Person's jurisdiction of formation or organization

(f) "<u>Governmental Entity</u>" means any supranational, national, state, municipal, local or foreign government; any state, commonwealth, province, district or territory thereof; any subdivision, court, department, commission, agency, authority or other instrumentality thereof including the U.S. Food and Drug Administration and the similar agencies of other nations; any central bank; any intergovernmental organization; and any other individual or group of individuals, entity or body (whether public, quasi-governmental or private) exercising any executive, legislative, judicial, arbitral, law enforcement, taxing, regulatory or administrative governmental or quasi-governmental function, including a self-regulatory organization and any entity owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing.

(g) "<u>Person</u>" includes individual, corporation, partnership (general or limited), joint venture, association, limited liability or joint stock company, bank, trust company, trust (whether a land trust, a business trust or otherwise), estate, unincorporated organization, Governmental Entity, and every other kind of legal, juridical, commercial and political person, entity, organization, department, bureau or agency whatsoever. A reference herein to a Person shall be construed to include such Person's Successors.

(h) "<u>Representatives</u>" means the members, principals, directors, officers and employees of a Party.

(i) "<u>Successors</u>" means a Person's heirs, executors, administrators, other successors and assigns.

(j) For purposes of this Agreement, unless otherwise expressly provided or the context otherwise requires, (i) "herein," "hereof" and words of similar import refer to this Agreement as a whole and not to any particular provision; (ii) a word defined anywhere in this Agreement has the same meaning throughout this Agreement; (iii) "shall" expresses an obligation (and "will" does not), "may" (not followed by "not") is permissive, and "shall not" and "may not" both forbid the action specified; (iv) each reference to a "Section," an "Article," an "Exhibit" or a "Schedule" refers to a section or an article of, or exhibit or schedule to, this Agreement; (v) whenever from the context it is appropriate, each word, whether stated in the singular or the plural, shall include both the singular and the plural; (vi) each word of any gender includes all genders; (vii) "or" is not exclusive (unless used in conjunction with "either"), "includes" and "including" are not limiting, but "means" is limiting; (viii) any reference to an agreement (including this Agreement), instrument or other document (1) includes any schedules, exhibits, annexes or other attachments thereto and (2) "as amended" means and is a reference to such agreement, instrument or other document as it has been or may be amended, amended and restat-

ed, supplemented, novated or otherwise modified from time to time (except to the extent, if any, that any such agreement, instrument or other document was amended, amended and restated, supplemented, novated or otherwise modified in breach of its own terms, the Compromise Order, this Agreement or Applicable Law); (ix) any reference to a statute (1) includes all regulations, rules, subordinate legislation and other Applicable Law issued or promulgated thereunder and all consolidations, codifications, re-enactments, extensions and replacements thereof and (2) "as amended" means and is a reference to such statute as it has been or may be amended, re-enacted, amended and restated, supplemented or otherwise modified from time to time; (x) any reference to a document being in a particular form or containing particular terms and conditions means and is a reference to such document being substantially in such form or containing substantially such terms and conditions; (xi) a reference to a Person in a particular capacity excludes such Person in any other capacity and individually; and (xii) a reference to a month refers to a calendar month and a reference to a year refers to a calendar year.

IN WITNESS WHEREOF, this Agreement has been executed by Vendor through its duly authorized officer effective as of the date set forth in the preamble.

**Team Support Services, LLC d/b/a Abraxas Worldwide**

By: _____

Name: _____
Title: _____
Date: _____

# ANNEX A

As used in this Agreement, "Services" means:

**Transportation and Shipping**. Abraxas will coordinate the transportation of Common Documents from their present location to Abraxas' facility.

**Intake**. Upon arrival at Abraxas, the cartons will be quality checked by Abraxas' Inventory Management team against the manifest included with the shipment to ensure the arrival of all expected boxes. Each carton will then be given a unique Abraxas identifier to ensure its traceability at all times while in Abraxas' custody. This unique identifier will be captured in Abraxas' Records Management System (RMS), along with all legacy box numbers found on the outside of each box. Upon completion of check in, the Inventory Management team will deliver the cartons to Abraxas' experienced indexing team for review and indexing.

**Indexing**. All boxes received without an existing index will be indexed by Abraxas team members into Abraxas' Records Management System (RMS) at the document level. Indexing will capture relevant information based on the record type (see Appendix A) to allow for expedient retrieval by any Sponsor(s) as needed. For boxes received where an index from Lachman exists, Abraxas will review the index and do a sample comparison to the physical boxes to ensure the accuracy and integrity of the indexing information. Abraxas will then import the data into the RMS to allow for all boxes and records to be searched by Abraxas for ease-of-use and single point of contact for the Common Documents Sponsors to submit requests for information. If the indexing appears to be accurate, Abraxas will convert the data to a format that can be imported to Abraxas' RMS. If the indexing does not appear to be accurate or incomplete, Abraxas will consult with the Common Documents Sponsors for approval to index those boxes following the same process as those received without an index.

**Storage**. Abraxas will store the Common Documents and make them available to any Common Documents Sponsor that wishes to retrieve a copy for the duration of the Term.

**Excluded Services**. For the avoidance of doubt, the Services do not presently include "scan and destroy" services nor do the Services include any intake, storage or management by Vendor of any electronic records. Such services can be added to the Services upon the written agreement of the Parties.

**Document Requests**. Document images and scanned images of hardcopy documents can be requested by any Common Documents Sponsor throughout the duration of the project work and subsequent storage. If records are needed at any time while in Abraxas' possession, they can be requested through Abraxas' customer request mailbox, Requests@Abraxasworldwide.com during regular business hours, or afterhours via the 24-hour call center. **Any associated expenses related to each request will be the sole responsibility of the requesting Common Documents Sponsor and is out of scope for this proposal.**

**EXHIBIT C**

## EXHIBIT "C" – SETTLEMENT BUDGET
### AMOUNTS INCURRED AND/OR PAID THROUGH MAY 31, 2014

| Payee | Paid to June (2013) | July | August | September | October | November | December | January | February | March | April | May | TOTAL INCURRED FROM JUNE 2013 - MAY 31, 2014 | UNPAID BUT BUDGETED AMOUNTS INCURRED PRE-MAY 31, 2014 | TOTAL INCURRED FROM JUNE 2013 - MAY 31, 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Rent, Security, Facilities, BioSpecimen (Inv.), Misc. Expenses** | $552,124.01 | $117,222.09 | $71,100.46 | $82,167.88 | $33,699.15 | $23,652.11 | $23,849.59 | $188,940.75 | $7,920.50 | $4,622.99 | $2,246.55 | $2,279.00 | $1,109,835.10 | $0.00 | $1,109,835.10 |
| Cintas | $1,985.12 | $599.13 | $620.63 | $648.53 | $599.13 | $599.13 | $623.05 | $623.05 | $623.05 | $623.05 | $623.05 | $623.05 | $8,766.25 | $0.00 | $8,766.25 |
| RecordKeepers | $3,244.55 | $2,118.02 | $1,053.01 | $1,053.01 | $1,233.88 | $1,247.43 | $1,241.81 | $1,241.81 | $1,241.81 | $1,241.81 | $1,241.81 | $1,241.81 | $17,400.74 | $0.00 | $17,400.74 |
| Iron Mountain | $433.18 | $218.34 | $218.34 | $218.34 | $218.34 | $218.34 | $218.34 | $227.08 | $227.08 | $227.08 | $227.08 | $227.08 | $2,878.62 | $0.00 | $2,878.62 |
| Iron Mountain | $370.14 | $439.42 | $435.07 | $435.07 | $435.07 | $435.07 | $435.07 | $435.07 | $435.07 | $435.07 | $444.76 | $444.76 | $5,679.64 | $0.00 | $5,679.64 |
| Great American Storage | $630.00 | $180.00 | $197.50 | $197.50 | $170.00 | $209.00 | $194.00 | $179.00 | $194.00 | $194.00 | $194.00 | $204.00 | $2,753.00 | $0.00 | $2,753.00 |
| Uhaul Moving & Storage | $980.51 | $298.00 | $298.00 | $298.00 | $298.00 | $298.00 | $269.90 | $269.90 | $269.90 | $269.90 | $313.80 | $283.80 | $4,147.71 | $0.00 | $4,147.71 |
| LightSpeed Courier | $0.00 | $0.00 | $16,796.25 | $0.00 | $0.00 | $11,577.75 | $3,859.25 | $7,718.50 | $4,193.60 | $4,193.60 | $3,875.00 | $4,512.20 | $56,726.15 | $0.00 | $56,726.15 |
| Linn Grove | $10,347.18 | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $44,859.68 | $0.00 | $44,859.68 |
| Gamma Fargo* | $0.00 | $0.00 | $0.00 | $0.00 | $20,935.00 | $20,935.00 | $20,935.00 | $20,935.00 | $20,935.00 | $13,515.65 | $10,935.00 | $11,375.00 | $140,500.65 | $0.00 | $140,500.65 |
| **Facilities, Storage, Misc. Monthly Totals:** | $570,634.67 | $124,222.50 | $93,856.76 | $88,155.83 | $60,726.07 | $62,309.33 | $54,799.25 | $223,707.66 | $39,181.51 | $28,460.65 | $23,238.55 | $24,328.42 | $1,393,547.54 | $0.00 | $1,393,547.54 |
| | | | | | | | | | | | | | | | |
| Ronald Hornberger Fees | $147,282.50 | $41,440.00 | $28,560.00 | $35,120.00 | $17,480.00 | $23,200.00 | $26,240.00 | $6,360.00 | $21,440.00 | $16,000.00 | $11,760.00 | $7,440.00 | $382,322.50 | $0.00 | $382,322.50 |
| Ronald Hornberger Expenses | $1,954.04 | $1,204.27 | $1,419.16 | $1,091.20 | $22.03 | $815.40 | $1,600.29 | $21.00 | $118.40 | $107.19 | $48.35 | $210.41 | $8,620.74 | $0.00 | $8,620.74 |
| CDG Fees & Expenses** | $935,101.43 | $255,077.99 | $210,431.52 | $77,995.81 | $26,256.21 | $25,134.74 | $0.00 | $0.00 | $0.00 | $11,278.18 | $0.00 | $412,943.76 | $1,954,239.64 | $0.00 | $1,954,239.64 |
| Trustee Fees | $84,677.42 | $27,720.00 | $25,533.00 | $24,504.00 | $5,700.00 | $5,898.00 | $5,303.00 | $3,640.00 | $7,515.00 | $5,635.00 | $9,013.00 | $6,335.00 | $213,273.42 | $5,322.58 | $218,596.00 |
| Trustee Expenses | $3,517.20 | $1,022.91 | $0.00 | $1,356.96 | $557.17 | $482.70 | $1,080.37 | $2,148.24 | $309.03 | $297.78 | $290.93 | $272.01 | $11,335.30 | $0.00 | $11,335.30 |
| Janet Rakowitz (Taxes) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,855.88 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $10,000.00 | $15,855.88 | $34,144.12 | $50,000.00 |
| Litigation Fees*** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $15,000.00 | $15,000.00 |
| **Professionals Monthly Totals:** | $1,169,015.59 | $338,959.46 | $266,966.59 | $140,067.97 | $52,055.41 | $61,386.72 | $34,233.66 | $12,169.04 | $29,182.43 | $33,318.15 | $21,112.28 | $437,201.18 | $2,585,667.68 | $54,466.70 | $2,640,134.18 |
| | | | | | | | | | | | | | | | |
| **Grand Total** | $1,739,650.06 | $463,181.96 | $360,823.35 | $228,223.80 | $112,781.48 | $123,696.05 | $88,972.25 | $235,876.90 | $68,369.94 | $61,778.80 | $44,350.83 | $461,529.60 | $3,979,215.02 | $54,466.70 | $4,033,681.72 |

\* Gamma Fargo payments are being made from 45% of Non-Funding Sponsor loan payments

\*\* Allowed per Order Approving First and Final Application for Approval of Compensation and Reimbursement of Expenses of CDG Group, LLC as Consultant for the Chapter 7 Trustee (Docket No. 614)

\*\*\* Fee amount agreed among Trustee, Lenders, Funding Sponsors, and Pullman, Cappuccio, Pullen, Benson & Jones

# EXHIBIT D

## EXHIBIT "D" - CLOSING BUDGET
## AMOUNTS INCURRED THROUGH OCTOBER 31, 2014 AND BUDGET TO CLOSE CASES

| Payee | June | July | August | September | October | Budgeted for November** | SubTotals To Date | Budgeted for December** | Budgeted for January** | Budgeted for February** |
|---|---|---|---|---|---|---|---|---|---|---|
| Reg. Agent Fees, Bank Fees, Misc. Expenses | $2,090.37 | $7,811.05 | $1,652.62 | $1,404.94 | $3,239.75 | $3,239.75 | $19,438.48 | $3,239.75 | $3,239.75 | $3,239.75 |
| Cintas | $623.25 | $623.25 | $623.25 | $623.25 | $623.25 | $623.25 | $3,739.25 | $623.25 | $623.25 | $623.25 |
| RecordKeepers | $1,241.81 | $1,517.72 | $1,406.33 | $1,406.33 | $1,406.33 | $1,644.66 | $8,623.18 | $1,644.66 | $1,644.66 | $1,644.66 |
| Iron Mountain | $227.08 | $227.08 | $227.08 | $227.08 | $227.08 | $227.08 | $1,362.48 | $227.08 | $227.08 | $227.08 |
| Iron Mountain | $444.76 | $444.76 | $444.76 | $444.76 | $444.76 | $444.76 | $2,668.56 | $444.76 | $444.76 | $444.76 |
| Great American Storage | $209.00 | $194.00 | $194.00 | $194.00 | $206.00 | $199.40 | $1,196.40 | $199.40 | $199.40 | $199.40 |
| Uhaul Moving & Storage | $283.80 | $283.80 | $283.80 | $343.80 | $283.80 | $295.80 | $1,774.80 | $295.80 | $295.80 | $295.80 |
| LightSpeed Courier | $4,193.60 | $4,193.60 | $4,193.60 | $4,193.60 | $4,193.60 | $4,193.60 | $25,161.60 | $4,193.60 | $4,193.60 | $4,193.60 |
| Linn Grove | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $3,137.50 | $18,825.00 | $3,137.50 | $3,137.50 | $3,137.50 |
| Gamma Fargo* | $11,375.00 | $11,375.00 | $11,375.00 | $11,375.00 | $11,375.00 | $11,375.00 | $68,250.00 | $11,375.00 | $11,375.00 | $11,375.00 |
| Facilities, Storage, Misc. Monthly Totals: | $23,826.17 | $29,807.76 | $23,537.94 | $23,350.26 | $25,137.07 | $25,380.80 | $151,040.00 | $25,380.80 | $25,380.80 | $25,380.80 |
| Ronald Hornberger Fees | $7,840.00 | $6,800.00 | $7,800.00 | $5,760.00 | $8,120.00 | $7,264.00 | $45,584.00 | $7,264.00 | $7,264.00 | $7,264.00 |
| Ronald Hornberger Expenses | $55.35 | $33.50 | $0.00 | $236.56 | $28.95 | $70.73 | $425.09 | $70.73 | $70.73 | $70.73 |
| Trustee Fees | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | $48,000.00 | $8,000.00 | $8,000.00 | $8,000.00 |
| Trustee Expenses | $186.25 | $300.00 | $300.00 | $300.00 | $271.56 | $271.56 | $1,629.37 | $271.56 | $271.56 | $271.56 |
| Professional Monthly Totals: | $16,081.60 | $15,133.50 | $16,100.00 | $14,296.56 | $16,420.51 | $15,606.29 | $93,638.46 | $15,606.29 | $15,606.29 | $15,606.29 |
| Grand Total: | $39,907.77 | $44,941.26 | $39,637.94 | $37,646.82 | $41,557.58 | $40,987.09 | $244,678.46 | $40,987.09 | $40,987.09 | $40,987.09 |

*Gamma Fargo payments are being made from 45% of Non-Funding Sponsor loan payments

**Budgeted amounts are calculated using average of June - October actual amounts